THE OHIO CASUALTY INSURANCE COMPANY, PLAINTIFF-APPELLANT AND CROSS-RESPONDENT, v. PAUL W. FLANAGIN, *ET AL.*, DEFENDANTS-RESPONDENTS, AND MODERN CLOTHING CO., INC., DEFENDANT-RESPONDENT AND CROSS-APPELLANT.

Argued January 4, 1965—Decided May 18, 1965.

506

*Mr. H. Hurlburt Tomlin* argued the cause for plaintiff-appellant and cross-respondent, Ohio Casualty Insurance Company.

*Mr. James L. Cooper* argued the cause for defendants-respondents, R. W. Wescoat, Inc., John A. Fletcher, Russell DeFrank, Anna Renzi, Ida R. Lucca, Ellen Malandra, Elvira Brown, Lena Rasputney, Theresa Benedetto, Elizabeth Small-wood, Bessie Schleyer, Giovanna Azzara, Marion Capella (*Messrs. Arkus & Cooper,* attorneys; *Messrs. Vincent A. De Marco, Phillip A. Gruccio, Lloyd, Horn, Megargee & Steedle, Mark A. DeMarco, Adamo & Pagluighi,* of counsel).

*Mr. Samuel A. Curcio* argued the cause for defendant-respondent and cross-appellant, Modern Clothing Co., Inc. (*Messrs. Curcio & Donio,* attorneys).

The opinion of the Court was delivered by

HANEMAN, J. The Ohio Casualty Insurance Company (Ohio) issued a "Manufacturers and Contractors Schedule Liability Policy" to Paul W. Flanagin (Flanagin), a building contractor. Multiple personal injury and property damage suits were instituted against the insured and others after the collapse of a building to which he was constructing an addition. Ohio thereupon filed a complaint seeking a declaratory adjudication that it had "no liability for defense or indemnification of the defendant, Paul W. Flanagin." In this action it joined not only the plaintiffs in the suits thereto filed against Flanagin but also numerous other parties who, although not having filed suits against the insured, allegedly sustained bodily injury as a result of the accident. The Chancery Division held that both the personal injury and property damage claims were, on their face, covered by the policy and that Ohio was therefore obligated to defend Flanagin. The trial judge, however, refused to adjudge the ultimate liability of Ohio and the question of Flanagin's negligence. On appeal, the Appellate Division affirmed as to the personal injury claims but reversed as to the property damage claims, holding that such latter claims were outside the scope of the policy and thus that Ohio was not required to defend. This Court granted certification upon petition of Ohio and cross-petition of Modern Clothing Co., Inc. (Modern), a property damage claimant and one of the defendants. 43 *N. J.* 134 (1964).

The following facts were developed at the trial: Flanagin entered into a written contract with Frank J. Domenico (Domenico) to construct an addition to a building owned by Domenico's corporation, Modern. This contract was entered into for the benefit of Flanagin's son, Evan Patrick Flanagin, who was to be in complete charge of the job. Flanagin thereafter subcontracted the excavation work to R. W. Wescoat, Inc. (Wescoat) by a written contract, and the masonry and concrete work to Russell DeFrank (DeFrank) by an oral contract. Having completed the excavation with a caterpillar

tractor and loader to the required depth and to within eight to ten feet of the existing wall, Wescoat refused to proceed any nearer thereto. There was considerable discussion between Evan Patrick Flanagin, Domenico, DeFrank and Wescoat as to the danger of the existing wall's collapsing if excavation were done in closer proximity. Domenico, in order to have the buildings connected and to utilize certain machines, insisted that the excavation be continued to within four feet of the wall, but finally approved excavation to within five or six feet. Since Wescoat would not dig within said eight to ten feet, DeFrank, at the request of Evan Patrick Flanagin or John S. Johnson (a Flanagin agent) hand-dug to within five or six feet of the wall. Although DeFrank was not obligated under his contract to undertake this phase of the work, and received no additional compensation therefor, he used two of his own laborers and two or three unidentified migratory laborers not employed by him. DeFrank did not pay the wages of these additional laborers but stated that they were paid by Flanagin. This is the sole testimony on this phase of the case, as it was impossible to locate any of these latter itinerant laborers and Evan Patrick Flanagin's whereabouts was then unknown.

During the course of this digging, the wall of Modern's existing building collapsed, causing the alleged damages for which some of the injured parties instituted the above mentioned suits. The actual complaints in those actions are not before us. However, the summary of the allegations of the complaints, as contained in Ohio's declaratory judgment complaint, discloses that all of the suits named Flanagin as a party defendant and that the basis for recovery, although not identically stated in each complaint, encompassed general allegations of "negligence, carelessness, and recklessness" in connection with the excavation work and sought judgment against Flanagin and others, either individually, severally or jointly. Flanagin called upon Ohio to defend these suits; Ohio disclaimed liability under its policy and advised Flanagin of

its intention not to defend on his behalf. As above noted, Ohio thereafter filed this declaratory judgment action, joining as defendants Flanagin, the plaintiffs in the suits filed against him, and numerous other parties with possible claims arising out of the accident. We assume that the contention of these latter parties as to the causation of the accident would be identical with that of the suing plaintiffs.

The issue is whether the policy covers the insured for either or both the personal injury and property damage claims resulting from the collapse of the wall caused by the excavation.

Ohio advances a dual basis for its nonliability by claiming that (1) the undertaking of the insurance carrier in the policy of insurance, limited and circumscribed by the exclusionary language, did not cover defendant Flanagin with respect to the accident here involved since the work which caused the accident was being performed by an independent contractor, and further that Flanagin's sole function in connection therewith was, at best, only general supervision; and (2) the accident was caused by excavation and was therefore excluded under the express terms of the policy.

## I.

Before treating of the issues here involved disposition should be made of defendants' argument that "one must look only to the complaint filed [in the damage actions] and, if it charges the defendant insured with liability on grounds within the scope of the coverage afforded, then it is the duty of the carrier to defend its insured." In that connection it should be noted that the policy in the instant case provides that the company shall "defend any suit against the insured alleging such injury, sickness, disease or destruction and seeking damages on account thereof, even if such suit is groundless, false or fraudulent; * * *."

An action by an insurer for a declaratory judgment seeking a judicial construction of a liability insurance policy

is most often undertaken after a claim thereunder has been made by the insured as the result of a suit against him and the insurer claims it need not defend because the loss is not within the policy coverage. The declaratory judgment suit thus brings into play a comparison of the factual allegations of the damage complaint with the terms of the policy. Generally, where the policy, as here, requires the insurer to defend even if such suit is groundless, false or fraudulent, the damage complaint is laid alongside the policy and the test is whether the allegations of that complaint, upon its face, fall within the risk insured against. *Danek v. Hommer*, 28 *N. J. Super.* 68, 77 (*App. Div.* 1953), affirmed 15 *N. J.* 573 (1954). The nature of the damage claim, rather than the actual details of the accident or the ultimate liability of the insurer, determines whether the insurer is obliged to defend. *Danek v. Hommer, supra; Van Der Veen v. Bankers Indemnity Ins. Co.*, 30 *N. J. Super.* 211, 217 (*App. Div.* 1954). See also *Hackensack Water Co. v. General Accident, etc., Ltd.*, 84 *N. J. Super.* 479, 483 (*App. Div.* 1964); *Ebert v. Baller*, 83 *N. J. Super.* 545, 553 (*Cty. Ct.* 1964); *Annotation*, 50 *A. L. R. 2d* 458, 465–66 (1956).

Thus, where an insurer bases its entitlement not to defend a damage action upon the contention that the true facts are at odds with the allegations of that action, and those facts must of necessity be ultimately proved in the ensuing damage action, the court should exercise its discretion and refuse to entertain the declaratory judgment suit. Except in unusual cases, the court should normally also refuse to consider a declaratory judgment action prior to the filing of a damage suit against the insured, where the issue under the former necessitates a determination of the causation of the accident. The reason for such a conclusion is found in the fact that the basis of the insurer's liability will be determined by the proofs adduced in the damage action, and it cannot be ascertained in advance of that trial which grounds of liability, if any, will be adjudicated against the insured. *Prashker v.*

*United States Guarantee Company,* 1 *N. Y.* 2d 584, 154 *N. Y. S.* 2d 910, 136 *N. E.* 2d 871, 874 (*N. Y. Ct. App.* 1956). See *Lee v. Aetna Casualty & Surety Co.,* 178 *F.* 2d 750, 752 (2 *Cir.* 1949); *Van Der Veen v. Bankers Indemnity Ins. Co., supra,* 30 *N. J. Super.,* at *pp.* 216–217; *Public Service Mutual Insurance Co. v. Jacobs,* 161 *N. Y. S.* 2d 791, 793 (*Sup. Ct.* 1952). However, special circumstances may warrant the trial of such factual issues before the trial of the damage action. *Cf. Manhattan Fire & Marine Ins. Co. v. Nassau Estates II,* 217 *F. Supp.* 196 (*D. C. N. J.* 1963); *Ohio Farmers Indemnity Co. v. Chames,* 170 *Ohio St.* 209, 163 *N. E.* 2d 367, 371 (*Ohio Sup. Ct.* 1959); *Condenser Service, etc., Co. v. American, etc., Ins. Co.,* 45 *N. J. Super.* 31, 40 (*App. Div.* 1957). In the matter *sub judice* the trial court might well have refused to permit the introduction of testimony concerning the causation of the wall collapse and confined itself to such a comparison of the complaints already filed with the terms of the policy. However, since both the trial court and the Appellate Division have considered the facts as adduced, we will proceed with a determination of the appeal and, where necessary, a consideration of such facts.

## II.

We come to a construction of the policy, keeping in mind the following guides as stated in *Mazzilli v. Acc. & Cas. Ins. Co. of Winterthur,* 35 *N. J.* 1, 7–8 (1961):

"Solution of a problem of construction of an insurance policy must be approached with a well settled doctrine in mind. If the controlling language will support two meanings, one favorable to the insurer, and the other favorable to the insured, the interpretation sustaining coverage must be applied. Courts are bound to protect the insured to the full extent that any fair interpretation will allow. *Kievit v. Loyal Protective Life Ins. Co., etc.,* 34 *N. J.* 475 (1961). Moreover, in evaluating the insurer's claim as to the meaning of the language under study, courts necessarily consider whether alternative or more precise language, if used, would have put the matter beyond reasonable question; also whether judicial decisions appear in the reports attributing

a more comprehensive significance to it than that contended for by the insurer. *Mahon v. American Cas. Co. of Reading, Pennsylvania*, 65 *N. J. Super.* 148 (*App. Div.* 1961). Insurance contracts are unipartite in character. They are prepared by the company's experts, men learned in the law of insurance who serve its interest in exercising their draftsmanship art. The result of their effort is given to the insured in printed form upon the payment of his premium. The circumstances long ago fathered the principle that doubts as to the existence of coverage must be resolved in favor of the insured. *Barker v. Iowa Mut. Ins. Co.*, 241 *N. C.* 397, 85 *S. E.* 2d 305 (*Sup. Ct.* 1955).

These general rules of construction have spawned a number of subsidiary ones of equally universal recognition. For example, where the policy provision under examination relates to the inclusion of persons other than the named insured within the protection afforded, a broad and liberal view is taken of the coverage extended. But, if the clause in question is one of exclusion or exception, designed to limit the protection, a strict interpretation is applied. *Cal-Farm Ins. Co. v. Boisseranc*, 151 *Cal. App.* 2d 775, 312 *P.* 2d 401, 405 (*D. C. App.* 1957)."

The resolution of the problem is to be found in a determination of whether the terms of the policy encompass the causation of the accident, *i. e.*, whether the allegations in the actions against Flanagin and the facts adduced at the trial of this action, give rise to a claim which may constitute a risk covered by the policy. *Danek v. Hommer, supra.* To reach such a factual determination the allegations of the damage complaint and the facts giving rise to the accident must "be laid alongside the policy and a determination made as to whether, if the allegations are sustained, the insurer will be required to pay the resulting judgment, and in reaching a conclusion, doubts should be resolved in favor of the insured." *Danek v. Hommer, supra*, 28 *N. J. Super.*, at *p.* 77. See 7A *Appleman, Insurance Law and Practice* § 4683 (1962).

The policy here in question is a standard form "Manufacturers and Contractors" policy. On the facing page, entitled "Declarations," appear a number of subheadings entitled "Item[s]." Item 1 contains the name of the insured and states that "The business of the named insured is Building Contractor." Item 3 reads:

"The insurance afforded is only with respect to such and so many of the following coverages and divisions thereunder as are indicated by specific premium charge or charges. The limit of the company's liability against each such coverage and division shall be as stated herein, subject to all the terms of this policy having reference thereto.

| Coverages | Limits of Liability | Divisions | Advance Premiums |
|---|---|---|---|
| A. Bodily Injury Liability | $100,000 each person<br>$300,000 each accident<br>$ aggregate<br>(Aggregate applies to Division 4 only) | 1. Premises-Operations<br>2. Elevators<br>3. Independent Contractors<br>4. Products-Completed Operations | $44.20<br>$<br>$<br>$ |
| B. Property Damage Liability | $50,000 each accident<br>$50,000. aggregate<br>(Aggregate applies to Divs. 1, 3 and 4) | 1. Premises-Operations<br>2. Elevators<br>3. Independent Contractors<br>4. Products-Completed Operations | $15.75<br>$<br>$<br>$ |
| C. Medical Payments | $ each person<br>$ each accident | 1. Premises-Operations<br>2. Elevators | $<br>$ |
| D. Contractual Liability of a Specified Type | $ each person<br>$ each accident<br>$ each accident<br>$ aggregate | 1. Bodily Injury Liability<br>2. Property Damage Liability | $<br>$ |
| | Annual Advance Premium | | $59.95" |

Item 4 contains four horizontal columnar divisions consisting of "Description of Hazards—Code No."; "Premium Bases"; "Rates"; "Advance Premiums." Vertically under the first heading appear five columns, entitled respectively "1. Premises—Operations"; "2. Elevators"; "3. Independent Contractors"; "4. Products-Completed Operations"; "5. Contractual—Specified Types of Agreements." The remaining three horizontal columns are blank. Opposite "Premises-Operations" in the first vertical column appears the following, inserted by typewriting:

| | [Code No.] |
|---|---|
| "Carpentry N.O.C. | 3457 |
| Paul W. Flanagin | 3457 |

Min. Prem. B. I. $19.25
" " P.D. $15.75
End. #5969 & L-9066 attached to policy."

Although there are figures in the other three horizontal columns opposite "Premises-Operations" they need not be detailed since they play no part herein. The horizontal columns opposite the remaining four vertical headings are left blank.

## A

Ohio first argues that since an advance premium is listed opposite "Bodily Injury Liability" and "Property Damage Liability" only for the "Premises-Operations" Hazard under Item 3 and Item 4, its total measure of exposure under the policy is limited to such liability as might be imposed upon Flanagin by reason of accidents caused during *his operations* as a building contractor. It reasons that Flanagin's failure to pay a premium for any of the other "Hazards" listed in Items 3 and 4, *i. e.*, Elevators, Independent Contractors, Products-Completed Operations, denotes that liability of the assured arising from an accident falling within any of those other descriptive categories is automatically excluded from coverage. From this it concludes that the accident which here occurred, having been caused by a subcontractor of Flanagin, falls within the thus excluded class of "Independent Contractors" Hazard and accordingly that it is neither obligated to defend nor to indemnify Flanagin.

 It is evident that this argument necessitates recourse to the balance of the policy for a disclosure of the connotation of the terms "Premises-Operations" and "Independent Contractors," for otherwise we are left with no basis upon which to ascertain what these otherwise unexplained words mean in the context in which they are employed. *Cf. National Fire Ins. Co. v. Elliott*, 7 *F.* 2d 522, 524, 42 *A. L. R.* 1121 (8 *Cir.* 1925). As above noted, the first page of the policy entitled

"Declarations" discloses that a premium was paid for insurance against claims for bodily injury and property damage resulting from "* * * -Operations" which is described as "Building Contractor." "Premises-Operations" is defined under "Division 1" of "Definition of Hazards" as "the ownership, maintenance or use of premises, and *all operations.*" (Emphasis supplied.) "Bodily Injury Liability" and "Property Damage Liability" are defined in the policy under the heading "Insuring Agreements," as follows:

"1 *Coverage A—Bodily Injury Liability:* To pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of bodily injury, sickness or disease, including death at any time resulting therefrom, sustained by any person, caused by accident and arising out of the hazards hereinafter defined."

"*Coverage B—Property Damage Liability:* To pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of injury to or destruction of property, including the loss of use thereof, caused by accident and arising out of the hazards hereinafter defined."

It is seen that Ohio agreed to pay on behalf of Flanagin "all sums which [he] shall become legally obligated to pay as damages" for bodily injury or property damage to "any person, caused by accident and arising out of" "all [of his] operations" as a "building contractor." This includes all damages resulting from an accident, however caused, arising out of his operations and for which the insured could be held legally liable, except those specifically excluded by the terms of the policy. If this generally imposed duty to so defend and indemnify is to be limited it must be by the express terms of one or more of the other modifying clauses of the insurance contract.

One of these clauses, says Ohio, reads:

"*Definition of Hazards* * * * *Division 3—Independent Contractors.* Operations performed for the named insured by independent contractors and general supervision thereof by the named insured, if the accident occurs in the course of such operations, * * *."

Ohio argues that since an extra premium is required for "operations performed for the named insured by independent contractors and general supervision thereof by the named insured," coverage for any accident resulting from the operations of a subcontractor is not included within the general category of "Premises-Operations." The fallacy in this argument is found in the following language of the policy under the title "Exclusions":

"This policy does not apply:
 \* \* \* \* \* \* \* \*
 (e) under division 3 of the Definition of Hazards, [*i. e.*, independent contractors], to any act or omission of the named insured or any of his employees, other than general supervision of work performed for the named insured by independent contractors; \* \* \*."

The above definition of the coverage under "Independent Contractors" Hazard is thus explained, modified, and restricted to include only "general supervision" by the insured of the work of independent contractors. No other act or omission of the prime contractor in connection with the work of a subcontractor and which may cause injury for which the insured may be liable under general laws of negligence is encompassed within the Independent Contractors Hazard. See *Majestic Realty Associates, Inc. v. Toti Contracting Co.*, 30 *N. J.* 425 (1959). As above noted, Ohio agrees to pay "all sums which the insured shall become legally obligated to pay as damages \* \* \* caused by accident and arising out of" "all operations" of Flanagin as a "building contractor." It follows that indemnity is provided for any liability Flanagin may incur under the laws of negligence, including any legally imposed liability for the acts of a subcontractor, except such liability as may arise from his general supervision of such subcontractor, he not having paid a premium for the "Independent Contractors" hazard.

### B.

In any event, says Ohio, the acts of Flanagin constituted at most only general supervision of DeFrank's work,

which is not covered by virtue of exclusion (e). The policy contains no definition of "general supervision." Construing the policy most favorably to the insured, as we must, *Linden Motor Freight Co., Inc. v. Travelers Ins. Co.*, 40 *N. J.* 511, 525 (1963), we conclude that these words are herein used in the sense that the prime contractor supervises the work of the subcontractor only to the extent necessary to see that the work is done in accordance with the contract and specifications. They do not connote control of the means to accomplish the required result. See *Trecartin v. Mahony-Troast Construction Co.*, 18 *N. J. Super.* 380, 386 (*App. Div.* 1952) ; *Wolczak v. National Electric Products Corp.*, 66 *N. J. Super.* 64, 71 (*App. Div.* 1961) ; *Marion v. Public Service Elec. & Gas Co.*, 72 *N. J. Super.* 146, 153 (*App. Div.* 1962). Additionally, the allegations of the damage complaints filed against Flanagin encompass factual allegations concerning the activities of the insured which a jury could find go beyond the intendment of "general supervision." It follows that these allegations (if proved at trial) fall within the policy coverage and impose on Ohio the duty to defend. *Prashker v. United States Guarantee Company, supra; Lee v. Aetna Casualty & Surety Co., supra.*

## C.

Ohio further states that it is relieved of liability for defense and indemnity under the facts herein present because of "Exclusions" (c) and (d).

### EXCLUSION (c).

Exclusion (c) reads:

"This policy does not apply :

\*　　\*　　\*　　\*　　\*　　\*　　\*　　\*

(c) under division 1 of the Definition of Hazards, and under coverage C, to (1) the Independent Contractors Hazard or (2) the Products-Completed Operations Hazard."

"Coverage C," for which Flanagin paid no premium, provides:

"*Coverage C—Medical Payments:* To pay all reasonable expenses incurred within one year from the date of accident for necessary medical, surgical and dental services, including prosthetic devices, and necessary ambulance, hospital, professional nursing and funeral services, to or for each person who sustains bodily injury, sickness or disease, caused by accident and arising out of the ownership, maintenance or use of premises owned, rented or controlled by the named insured and the ways immediately adjoining on land, or operations of the named insured."

"Coverage C" thus provides for various medical payments by the insured to one sustaining bodily injury on the premises described in the policy or caused by any of the operations of the insured regardless of the negligence or liability of the insured therefor. It has no effect upon the liability coverage under the bodily injury limits of "Coverage A" and is independent thereof. *The National Underwriter Service, Fire, Casualty and Surety Bulletins, Mp-1 (4th Printing (1955))*: It is thus seen that Coverages A and B, for which Flanagin paid a premium, are concerned with completely different subjects from that of Coverage C. The conclusion follows that Exception (c) is limited to Coverage C and does not affect Coverages A and B for which Flanagin paid a premium and under which he seeks to hold Ohio. Accordingly, this exception, as herein material, could be paraphrased so as to read "Coverage C of this policy does not apply to operations of the insured under the Independent Contractors Hazard."

## EXCLUSION (D).

Exclusion (d) reads:

"This policy does not apply:
\* \* \* \* \* \* \*
(d) under divisions 1, 2 and 3 of the Definition of Hazards, to liability *assumed* by the insured under any contract or agreement;"
(Emphasis supplied)

Were we to accede to the wide scope of this exception for which Ohio argues, even though a premium had been paid for "Independent Contractors" coverage no protection would be afforded the insured-premium payor for that Hazard because an independent contractor is, as the name signifies, a party to a "contract or agreement" with the insured. Merely to state such a result is to demonstrate its fallacy.

Peculiarly, "Contractual Liability of a Specified Type" is listed not only as a Coverage (Coverage D) in Item 3, but is also listed as a measure of exposure (Hazard) under item 4 as "5. Contractual-Specified Types of Agreements." Opposite the "Hazard" listing appear blank spaces for the insertion of premiums for coverage under Coverage D. Only one familiar with the mystique of odd insurance verbiage could possibly explain the reason for this duplicitous listing under different and unrelated headings. What this exception must have exclusive reference to is "Coverage D" which reads:

"*Coverage D—Contractual Liability of a Specified Type:* To pay on behalf of the insured all sums which the insured, by reason of the *liability assumed* by him under any of the following types of agreements, if in writing and if described in Item 4 of the declarations, shall become legally obligated to pay as damages because of:

*Division 1. Bodily Injury Liability*—bodily injury, sickness or disease, including death at any time resulting therefrom, sustained by any person and caused by accident.

*Division 2. Property Damage Liability*—injury to or destruction of property, including the loss of use thereof, caused by accident.

*Types of Agreements:*

(1) a sidetrack agreement;

(2) an easement agreement in connection with a railroad grade crossing;

(3) an agreement required by municipal ordinance in connection with work for the municipality." (Emphasis added)

Accordingly, exclusion (d), as far as it relates to our present problem, is intended to and does refer only to contractually created liability and does not relate to or have any effect upon the general liability of the insured arising by operation of the law of negligence for any act or omission of a subcontractor. It relates to what are called, in common parlance, "hold harm-

less" agreements. *The National Underwriter Service, Fire, Casualty & Surety Bulletins, B-1* (*3d Printing* 1960). It has no relationship to the "Premises-Operations" Hazard of Coverages A and B under which Flanagin is seeking to hold Ohio.

## D.

Ohio also argues that it is not liable under the terms of this policy because the alleged property damage was caused by excavation work. It refers to Exclusion (n) which reads:

"This policy does not apply:

\* \* \* \* \* \* \* \*

(n) under coverage B, with respect to division 1 of the Definition of Hazards, to injury to or destruction of any property arising out of \* \* \* (2) the collapse of or structural injury to any building or structure due (a) to grading of land, excavation, borrowing, filling, back-filling, tunneling, pile driving, coffer-dam work or caisson work, \* \* \*."

The scope of this section, however, is delimited by a *proviso* which reads as follows:

"\* \* \* part (2) of *this exclusion does not apply to operations stated, in the declarations or in the company's manual,* as not subject to such part of this exclusion." (Emphasis supplied)

The company's manual was not introduced at the trial and hence was not before the Appellate Division. Without the benefit of that manual to ascertain whether Flanagin's classification in the policy in question was subject to exclusion (n), the Appellate Division quite naturally reached the conclusion that Ohio was not obligated to defend Flanagin against property damage claims. This Court exercised its original jurisdiction and obtained production of the manual. *R. R.* 1:5–4.

▮▮▮▮ Recourse to the pertinent portions of the manual to discover whether the policy in question, which implements the manual, is subject to exclusion (n) discloses the following under the heading "Exclusions," at *p.* 4b:

"(n) *Special Property Damage Liability Classification Exclusions.* Additional property damage *liability exclusions apply to certain classifications.* Such exclusions are identified by the symbols c, d, e, u and x following the property damage rates and minimum premiums appearing on the state rate pages. For explanation of these symbols see Rate Section of this manual." (Emphasis supplied)

The manual further provides, under the heading "Explanation of Symbols Appearing on Rate Pages," at *p.* 104:

"c the Property Damage Liability rate and minimum premium for the classification exclude coverage for injury to or destruction of any property arising out of the collapse of or structural injury to any building or structure due
(1) to grading of land, excavation, borrowing, filling, back-filling, tunneling, pile driving, coffer-dam work or caisson work, * * *."

In order for the exclusion from liability for "injury to or destruction of any property" (exclusion (n)) to apply to this policy, it thus follows that the letter "c" must appear on the rate page opposite the classification (*i. e.,* Code No. 3457) allotted to Flanagin by the agent of Ohio who wrote the policy. An examination of the appropriate page discloses no such letter. Accordingly, the Flanagin policy is not subject to or limited by exclusion (n). See *The National Underwriter Service, Fire, Casualty and Surety Bulletins,* Dp-4 (7th Printing 1964).

This conclusion is strengthened by the nonappearance of any letters opposite the "Classification" designation "Carpentry N.O.C. 3457," at *page* 39 of the manual, although such letters do appear opposite many other classifications, and by the testimony of Ohio's agent who wrote the policy. He testified that at the time of Flanagin's application he informed him of an alleged subcontractor exclusion. On cross-examination the agent testified that, subject to that limitation, "* * * Whatever he was liable for himself, personally, he would be covered." The following colloquy also took place:

"Q. Did you explain to him anything about limitations on the coverage of the policy besides that which you have already told the Court?

A. Well, I personally know of no other limitations.
Q. You personally know of no other limitations other than the limitation on specific acts of sub-contractors?
A. That is correct."

### III

We agree with the trial court that the ultimate question of negligence was not an issue in the declaratory judgment action and should not have been passed upon by him. As above stated, the allegations of the cause of the accident, as contained in the actions against the insured, are the determining factors of the insurer's obligation to defend and not the actual facts of the causation of the accident. It follows that only upon the trial of the damage actions can the real cause of the accident be determined, and as a result of the adjudication of that suit the liability of the insurer be ascertained. Hence, we here pass upon neither the question of negligence nor the ultimate liability of the insurer. We conclude solely that Ohio is obligated to defend both the personal injury and property damage suits which have been undertaken, and such future suits as may allege similar grounds for recovery.

Accordingly, the judgment of the Appellate Division insofar as it concerns personal injury claims is affirmed, and insofar as it concerns property damage, is reversed.

*For affirmance in part and reversal in part*—Chief Justice WEINTRAUB, and Justices JACOBS, FRANCIS, PROCTOR, HALL, SCHETTINO and HANEMAN—7.

*Opposed*—None.