The **FIDELITY AND CASUALTY COMPANY OF NEW YORK**, a New York corporation authorized to do business in New Jersey, Plaintiff,

v.

**CARLL AND RAMAGOSA, INC.**, a New Jersey corporation, Casino Pier Co., a New Jersey corporation, and David Thompson, Margaret Thompson, James Thompson, Jack Dye and Mrs. Jack (Fictitious) Dye, Defendants.

Civ. A. No. 808-64.

United States District Court
D. New Jersey.
July 15, 1965.

Augustine A. Repetto, Atlantic City, N. J., for plaintiff.

Perskie & Perskie, by Marvin D. Perskie, Wildwood, N. J., for defendant-counterclaimant Carll and Ramagosa, Inc.

Kisselman, Devine, Deighan & Montano, by Peter J. Devine, Jr., Camden, N. J., for defendant-crossclaimant Casino Pier Co.

Thomas W. Rauffenbart, Atlantic City, N. J., for defendants David Thompson, Margaret Thompson, James Thompson, Jack Dye and Mrs. Jack (Fictitious) Dye.

Arkus & Cooper, by James L. Cooper, Atlantic City, N. J., for defendant Hunt's Enterprises, Inc.

Cole & Koury, by Maurice Y. Cole, Atlantic City, N. J., for defendant City of Wildwood.

COHEN, District Judge:

A judicial determination is sought in this diversity action adjudicating the obligations, if any, under a liability insurance policy, of the plaintiff, The Fidelity and Casualty Company of New York (Fidelity), to investigate a fire and defend its assureds in a pending state court tort action for death and injuries to minor children sustained on an amusement pier in the City of Wildwood, New Jersey.

On August 4, 1964 at approximately 6:00 P.M., four minor children, Gregory Thompson, Michael Thompson, James Thompson and Melody Dye, all under the age of fourteen years, while joyfully engaged as occupants of an amusement device, known as the "Mars Ride", tragically sustained injuries resulting in the death of all but James Thompson, the sole survivor. The cause of this disaster was a hostile and raging fire. At the time in question, the defendant-counterclaimant, Carll and Ramagosa, Inc. (Carll), was the amusement pier tenant-operator under a lease with the defendant, Casino Pier Co. (Casino), the owner of the mercantile and amusement ventures, known as the Casino Pier Arcade,

situated on the boardwalk at Oak and Cedar Avenues, in Wildwood, New Jersey. Fidelity had issued its liability insurance policy No. LZ25155, which was in effect at the time in question, to Carll as tenant-operator, and Casino as an added assured by virtue of its ownership of the premises.

When notified of the fire by Carll, and of claims and potential litigation, Fidelity promptly disclaimed liability by notice dated August 19, 1964. Two weeks later, Fidelity filed in this court the present complaint for Declaratory Judgment,[1] seeking absolution under its policy from any obligation to investigate the mishap, to defend court litigation assertable against the assureds Carll and Casino, and endeavoring to insulate itself from liability by reason of any judgments potentially recoverable against the defendants. Shortly thereafter, Carll instituted a similar action in the Superior Court of New Jersey, Cape May County, requesting the judicial imposition of such obligations upon Fidelity. In September, 1964, Fidelity secured removal of the Carll action to this Court. Both actions will be considered as consolidated for purposes of expedition. In the main action, Carll has counterclaimed, asserting policy coverage of the claims against it, and Casino, as the added assured, has crossclaimed against Carll to indemnify and save it harmless under the Fidelity policy.

In addition to the declaratory judgment sought by plaintiff, all parties have filed motions for summary judgment seeking construction of the liability policy as a matter of law. In reaching its conclusion, the Court has before it the liability insurance policy, the amusement pier lease, a deposition, affidavits and the pleadings constituting the record.

The crucial issue is whether Fidelity's liability insurance contract with Carll and Casino provides such coverage as to impose upon it the obligations of investigation and defense of litigation arising out of the fire, as well as ultimate liability in the event that judgment is returned against either or both of its assureds.

Fidelity insists that regardless of the cause of the fire, the injuries and deaths of the minor children resulted from their occupancy of the "Mars Ride" amusement device, a hazard specifically within an exclusionary clause of its policy, thus absolving it from obligation or liability. The exclusionary clause, a typewritten as distinguished from a printed provision, inserted by Fidelity as an addendum to its policy reads as follows:

"It is hereby understood and agreed that this policy excludes coverage for any claims arising out of the insureds interest as 'tenant' and 'operator' of any and all amusement devices, danceland and shooting gallery."

The insurance contract to which the above is attached is a standard form Comprehensive General Liability, America Fore Loyalty Group printed policy issued by Fidelity to Carll wherein the insurer agreed as follows:

"Insuring Agreements

1. Coverage A—Bodily Injury Liability

To pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of bodily injury, sickness or disease including death at any time resulting therefrom sustained by any person and caused by accident.

Coverage B—Property Damage Liability

To pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of injury to or destruction of property including the

---

1. Federal Declaratory Judgment Act, 28 U.S.C. § 2201.

loss of use thereof caused by accident.

11. **Defense, Settlement, Supplementary Payments**

With respect to such insurance as is afforded by this policy, the company shall (a) defend any suit against the insured alleging such injury, sickness, disease or destruction and seeking damages on account thereof even if such suit is groundless, false or fraudulent, but the company may make such investigation, negotiation and settlement of any claim or suit as it deems expedient."

There follows printed standard "exclusions" relating to products hazard, contract obligations other than independent contractors, workmen's compensation provisions, etc. Attached to the policy declarations sheet is a separate "Exclusion of Products Hazard," as well as an amendment of the Alcoholic Beverage exclusion clause, both in printed form. The endorsement for the additional assured, Casino, contains the following schedule:

"SCHEDULE

| Designation of Premises (Part Leased to Named Insured) | Name of Additional Assured | Premiums | |
| --- | --- | --- | --- |
| | | Bodily Injury Liability | Property Damage Liability |
| Casino Pier Wildwood, N. J. | Casino Pier Co. | 82.30 | 1.10 |
| | Total Premium | $82.30 | $1.10 |
| | | (Included in pol.)" | |

Defendant Carll counters Fidelity's position, insisting that the losses and negligence claims did not arise out of its tenancy of amusement devices, or result from operation of the amusement ride, but rather from a hostile fire completely unconnected with the "Mars Ride"; and that therefore the exclusionary clause of the policy does not embrace the present occurrence. It contends that the terms of its policy providing for defense and assumption of liability are effective for its benefit.

Defendant Casino urges that the "hold harmless" endorsement, or indemnity clause of the Carll policy was an undertaking by Fidelity to make Casino an added assured as "owner", without express restrictive language imposing exception, limitation or qualification. It argues that if Fidelity sought to limit the extended insurance protection and to delimit the scope of its liability, it could, it should, and it must in fact have done so with precision under the law of insurance contracts.

Such then is the agreement undertaken by the parties, as well as their respective contentions.

In contract law a fundamental function of the Court is to enforce, not rewrite, the agreement of the contracting parties in accordance with their intentions as evidenced by the contract. Kampf v. Franklin Life Ins. Co., 33 N.J. 36, 161 A.2d 717 (1960); Metzler v. London Guarantee & Accid. Co., Lt'd., 20 N.J.Super. 497, 90 A.2d 81 (App.Div. 1952). The duty to defend and indemnify arises when a claim or complaint states a cause of action within the area of risk insured against. As stated in the recent decision of the Supreme Court of New Jersey, Ohio Casualty Insurance Company v. Flanagin et al., 44 N.J. 504, at page 512, 210 A.2d 221, at page 225, (decided May 18, 1965):

"Generally, where the policy as here, requires the insurer to defend even if such suit is groundless, false or fraudulent, the damage complaint is

laid alongside the policy and the test is whether the allegations of that complaint, upon its face, fall within the risk insured against. (citation omitted.) The nature of the damage claim, rather than the actual details of the accident or the ultimate liability of the insurer, determines whether the insurer is obliged to defend." (citing authorities)

Paragraph 7 of the negligence complaint filed in the pending New Jersey State Court action reads as follows:

"7. The said injuries resulting in the deaths of the said minors were caused by the negligent, careless, reckless, willful and wanton misconduct of the defendants, their agents, servants and employees jointly and severally, in failing to properly conduct, operate and maintain the Casino Arcade Pier, the ride 'Mars', the area beneath the pier, and in permitting the pier and the ride to operate as a place of amusement when it was unsafe for this purpose."

■ Turning to the policy for a construction of the agreement undertaken by the parties, the language quoted from Mazzilli v. Acc. & Cas. Ins. Co. of Winterthur, 35 N.J. 1, 7–8, 170 A.2d 800 (1961) in Ohio Casualty, supra, 44 N.J. page 513, 210 A.2d page 226, is equally pertinent here:

"Solution of a problem of construction of an insurance policy must be approached with a well settled doctrine in mind. If the controlling language will support two meanings, one favorable to the insurer, and the other favorable to the insured, the interpretation sustaining coverage must be applied. Courts are bound to protect the insured to the full extent that any fair interpretation will allow. Kievit v. Loyal Protective Life Ins. Co., etc., 34 N.J. 475, 170 A.2d 22 (1961). Moreover, in evaluating the insurer's claim as to the meaning of the language under study, courts necessarily consider whether alternative or more precise language, if used, would have put the matter beyond reasonable question; also whether judicial decisions appear in the reports attributing a more comprehensive significance to it than that contended for by the insurer. Mahon v. American Cas. Co. of Reading, Pennsylvania, 65 N.J.Super. 148, 167 A.2d 191 (App.Div.1961). Insurance contracts are unipartite in character. They are prepared by the company's experts, men learned in the law of insurance who serve its interest in exercising their draftsmanship art. The result of their effort is given to the insured in printed form upon the payment of his premium. The circumstances long ago fathered the principle that doubts as to the existence of coverage must be resolved in favor of the insured. Barker v. Iowa Mut. Ins. Co., 241 N.C. 397, 85 S.E.2d 305 (Sup.Ct.1955).

"These general rules of construction have spawned a number of subsidiary ones of equally universal recognition. For example, where the policy provision under examination relates to the inclusion of persons other than the named insured within the protection afforded, a broad and liberal view is taken of the coverage extended. But, if the clause in question is one of the exclusion or exception, designed to limit the protection, a strict interpretation is applied. Cal-Farm Ins. Co. v. Boisseranc, 151 Cal.App.2d 775, 312 P.2d 401, 405 (D.C.App.1957)."

■■ In assessing the present policy coverage, the area of obligation on the part of the insurer must be refined, distinctively, into present duty and ultimate liability. Ultimate liability, if any, is dependent upon the factual establishment of proximate cause of injury in the negligence action. The latter consideration is of necessity premature and beyond the province of declaratory judgment.

Ohio Casualty, supra, 44 N.J. at page 512, 210 A.2d 221. Resolution of the problem regarding present duty depends upon whether the allegations of the complaint, if proved, are embraced within an area of risk which would impose upon the insurer an obligation to pay a resulting judgment. We are considering causation of the occurrence as alleged in the complaint, not ultimate factual establishment of proximate cause, and whether such factual allegations give rise to a claim, which may constitute a risk covered by the policy. Ohio Casualty, supra, at page 514, 210 A.2d 221. In testing the allegations in this sphere of inquiry, doubts should be resolved in favor of the assured. Danek v. Hommer, 28 N.J.Super. 68, 77, 100 A.2d 198 (App.Div.1953), affirmed per curiam, 15 N.J. 573, 105 A.2d 677 (1954); See Annotation: Liability Insurer—Duty to Defend, 50 A.L.R.2d 458; cf. Milliken v. Fidelity and Casualty Company of New York, 338 F.2d 35 (10 Cir. 1964).

In face of the allegations in the instant negligence action, plaintiff advances the bare hypothesis that the origin of the fire *could* have been caused by the malfunction of the amusement ride device, a risk excluded from its policy coverage. This is sheer speculation generated to invoke exclusion of risk and warrant disclaimer. In contrast, the uncontradicted affidavits of defendant-assureds, to which reference is made later, aver that the fire originated in the storage area located beneath the main deck of the amusement pier containing the "Mars Ride." This diametric divergency of view in the area of causation, replete as it is with manifold possibilities, points up the manifest ambiguity in the exclusionary clause. If the insurer, as draftsman of the contract, sought to exclude certain foreseeable possibilities or eventualities, it surely could have done so. The law recognizing this has evolved the principle that an insurer seeking to delimit the scope of its liability and exclude specific risks and hazards must do so with preciseness of express language. Mahon v. American Casualty Co., 65 N.J.

Super. 148, 167 A.2d 191 (App.Div. 1961). And the burden of proving facts sufficient to bring the occurrence clearly within the exclusionary clause is upon the insurer. Liberty Mutual Ins. Co. v. Hercules Powder Co., 224 F.2d 293, 54 A.L.R.2d 513 (3 Cir. 1955). As stated in that case at page 294:

"* * * when a party chooses the language which he puts into a form contract, in case of doubt of its effect the general rule is that it is interpreted against him."

The exclusionary clause directed to Carll as "tenant" and "operator" of amusement rides and devices was a typed addendum to the policy. At best, it lacks the traditional literary artistry which has grown with the technique of insurance draftsmen circumscribing the risks undertaken for a price. If the parties had contemplated no protection for Carll regarding the operation and characteristic functions of these precise mechanical agencies, as well as areas adjacent thereto, whether access platforms, pier deck, stairs, ingress and egress routes, the insurer could, would and should have done so. Mahon v. American Casualty Co., supra. It is improbable that the parties intended to exclude the amusement area of the Casino Pier as a locality from insurance protection. Otherwise, under the policy *all* risks and hazards pertaining to the amusement pier would be eliminated rendering the purported agreement for protection by insurance against loss meaningless. If the interpretation urged by Fidelity is placed upon the insurance contract, then it may well be asked what protection, if any, did Carll buy and what risks, if any, did Fidelity undertake? Surely, nothing in either regard. Such a construction contains the seeds of its own destruction. In Tomaiuoli v. United States Fid. & Guar. Co., 75 N.J.Super. 192, at page 200, 182 A.2d 582, at page 587 (App. Div.1962), it was said:

"Generally speaking, insurance policies are to be strictly construed against the insurer, with the court being bound to protect the insured

to the full extent that any fair interpretation of the policy will allow, and to interpret the policy as sustaining coverage where the language will support two meanings, one favorable to the insurer and the other favorable to the insured."

As stated by the Supreme Court of New Jersey in Kievit v. Loyal Protective Life Insur. Co., 34 N.J. 475, at page 482, 170 A.2d 22, at page 26 (1961):

"When members of the public purchase policies of insurance they are entitled to the broad measure of protection necessary to fulfill their reasonable expectations. They should not be subjected to technical encumbrances or to hidden pitfalls and their policies should be construed liberally in their favor to the end that coverage is afforded 'to the full extent that any fair interpretation will allow.' "

These are the views of the New Jersey Court, and of this Court. Erie R. Co. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938).

Fidelity places great stress on the fact that in the past, Carll had procured liability insurance coverage from Lloyds of London for the amusement rides, and also has obtained such coverage since the occurrence in suit. It contends that this demonstrates that Carll, as an experienced businessman conversant with these matters, knew he had no coverage from Fidelity for the existing incident, and that such excluded risk was within the contemplation of the parties when the present policy was drawn.

In his deposition, Gilbert Ramagosa, the *alter ego* of Carll, conceded that in prior years he had secured insurance coverage for the operation of the mechanical amusement rides and devices, *per sese;* but that these policies were later abandoned, and settlements effected of damage claims by the corporate attorney out of corporate funds. After the fire, he caused his insurance broker to survey that specific type of coverage for the amusement devices, and did ultimately secure such at a large premium. He deposed that his understanding of the restriction on the policy was for the usual "run-of-the-mill" bumper-car injuries, and the thousands of "cuts" and "bruises" to which children are heir; he did not understand the restriction to deprive him of protection regarding other causes of injuries, or arising on other parts of the leased premises such as the pier, stairs and platforms. This latter view of the agreement between the parties stands uncontradicted in the present record, and is the more plausible one warranting acceptance.

With respect to any malfunction of the "Mars Ride" itself, the affidavit dated August 5, 1964 of Kenneth A. Navasak, in charge of its maintenance, stated that the ride involved an electrically operated car, carried to a second floor by a chain powered by an electric motor and gear box, which was oiled weekly, and surrounded by a leak-trough, to avoid oil leaks onto the ride. The equipment had been completely dismantled and cleaned within a month of the fire, and had been inspected by him every other day. Furthermore, he states that beneath the "Mars Ride" section of the pier a storage area contained combustible trash from time to time and over a long period.

Elmer Hamilton, an operator of a concession at the other end of town on the Wildwood Boardwalk, stated by affidavit dated August 7, 1964 that at the time and place in question, he saw the manager of Hunt's Theatres, accompanied by two ushers, running with a fire extinguisher, and that flames of fire were emanating from the theatre trash bins beneath the pier.

Defendant Carll supplies these facts by affidavits to negate any question of malfunction of its amusement ride, and to eliminate any supposition that the fire originated in or by reason of the operation of such ride. Fidelity parries by arguing that the origin of the fire as to cause, location, connection or lack thereof with the operation of the ride has no pertinency to the issue of coverage. It

insists that the losses sustained are based on claims arising out of the insured's interests as tenant and operator and come directly within the exclusionary provision of the policy. This thrust, while forceful, misses the mark. Causation is pertinent in ascertaining existence of present policy coverage; it is impertinent as to details of proximate cause. Ohio Casualty, supra, 44 N.J. page 514, 210 A.2d 221. The fire was evidently the generic cause of the injuries and deaths for which complaint has been made. Broadly considered, it is reasonably deducible that, but for this tragic fire, these children would have been uninjured and alive at the completion of their amusement ride.

The exclusion contemplated by the contracting parties, as manifested by the exclusionary clause and when read as a limitation of the entire insurance contract, pertains to injuries and losses sustained by reason of the operation of the amusements, either because of negligence or malfunction. The exclusion is restrictively selective, as distinguished from comprehensively extensive. Mahon v. American Casualty Co., supra. Strict construction of this clause dictates that the exclusion be confined to risks reasonably incident to Carll's control of the amusement rides as the tenant and operator thereof, as distinguished from owner, and as being that which the parties contemplated by their contract, but does not extend to all pier and amusement device housing areas controlled by Carll, or to causes of injury or loss not foreseeably incident to the function of such amusements. It is the careless things as well as the foolish things that confound the wise. And in unipartite insurance policies, ambiguous exclusionary clauses giving rise to doubts and diverse interpretations are confounding to courts no less than to insureds. Hence, the rule of strict construction against the insurer.

In like manner, the tort action complaint places the situs of the injuries and deaths on the leased premises owned by Casino, charging it with negligence by reason of its "ownership, maintenance and use", and by its failure to provide a safe place of amusement at its Casino Arcade Pier.

By its lease, Carll had agreed to save Casino harmless from liability for injuries to persons or losses "in, on or about the demised premises", and Fidelity had agreed by its added assured provision to cover any liability assumed by Carll under said lease to an extent in the aggregate of $25,000.00. This triparty relationship falls squarely within the defined coverage.[2] The criteria of Ohio Casualty and Danek, supra, of comparison of policy and tort allegation, as well as strict construction of restrictive or exclusionary language of the insurance contract, extend as well to Casino as owner of the premises in question. Therefore, plaintiff Fidelity is obligated under its policy to provide Carll a defense to the crossclaims and to assume liability in the event of judgment against Casino.

2. "(4) LESSEE shall at all times keep and maintain the demised premises in a good and sanitary state and condition of repairs and shall keep demised premises always free from any accumulation of trash, rubbish, garbage, or any inflammable, dangerous or obnoxious substance or materials, and at the expiration of the within lease or any prior termination thereof, LESSEE shall yield up and peaceably surrender possession with all appurtenances thereto in as good a state and condition as the same now are, or may be put into, reasonable wear and tear thereof excepted."

\* \* \* \* \*

"(9) LESSEE agrees to save the LESSOR harmless from any liability by reason of personal injury to any person or persons in, on or about the demised premises or any part thereof, and to carry indemnity insurance against the said liability, and LESSEE shall and does hereby assume any and all liability for damages or injuries which made (sic) arise any accident or other casualty in, on or about such premises. LESSEE further agrees to furnish LESSOR with a certificate of insurance certified to be a true copy of LESSEE'S liability insurance contract."

This is not to say, that the ultimate question of negligence is being determined hereby. As stated in Ohio Casualty, supra, 44 N.J. at page 524, 210 A.2d at page 232:

" * * * the allegations of the cause of the accident, as contained in the actions against the insured, are the determining factors of the insurer's obligation to defend and not the actual facts of the causation of the accident. It follows that only upon the trial of the damage actions can the real cause of the accident be determined, and as a result of the adjudication of that suit the liability of the insurer be ascertained. Hence, we here pass upon neither the question of negligence nor the ultimate liability of the insurer."

The sole adjudication, aside from the specific rulings, is that Fidelity is obliged to defend the damage suit which has been initiated, as well as such future suits as may allege similar grounds for recovery against defendants Carll and Casino within the rationale and ambit of this opinion.

Accordingly, Fidelity's motion for summary judgment is dismissed.

Carll's motion for summary judgment is uncontroverted by Fidelity and presents no genuine issue of material fact on the legal question of policy coverage. It is hereby granted with respect to Fidelity's obligations of defense, but not as to its ultimate liability for negligence. Robin Construction Co. v. United States, 3 Cir., 345 F.2d 610 (decided May 14, 1965).

Casino's motion for summary judgment imposing upon Fidelity defense and indemnity obligations, and as against Carll, to hold it harmless by way of indemnification, is likewise uncontroverted. It presents no genuine issue of material fact on the legal question of policy coverage and is hereby granted.

Counsel may submit appropriate orders in accordance herewith by consent or upon notice.